## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ELEANOR DENMAN, both individually** | : | |
| **and as the Administrator of the Estate** | : | No. 1:23-cv-01918 |
| **of Ulysses Denman,** | : | |
| **Plaintiff** | : | (Judge Kane) |
| | : | |
| **v.** | : | |
| | : | |
| **JOHN WETZEL, et al.,** | : | |
| **Defendants** | : | |

## MEMORANDUM

Before the Court is Defendant MHM Correctional Services, LLC ("MHM" or "Defendant

MHM")'s motion to dismiss (Doc. No. 34) the amended complaint (Doc. No. 25) filed by

Plaintiff Eleanor Denman ("Plaintiff"), both individually and as the Administrator of the Estate

of Ulysses Denman.  For the reasons that follow, the Court will grant the motion to dismiss.

## I.    BACKGROUND

### A.    Factual Background[1]

On November 20, 2021, Plaintiff's son, Ulysses Denman ("Denman" or "decedent"),

tragically took his own life while incarcerated at State Correctional Institution Camp Hill ("SCI-

Camp Hill").  (Doc. No. 25 ¶¶ 1, 24.)  Plaintiff alleges that Denman's suicide was "not an

anomaly, but rather a part of an ongoing, systemic breakdown that has continuously failed those

with serious mental illness within the Pennsylvania State Prison system."  (Id. ¶ 23.)

---

[1]  The factual background is drawn from Plaintiff's amended complaint (Doc. No. 25), the
allegations of which the Court accepts as true for purposes of the pending motion to dismiss.  See
Kedra v. Schroeter, 876 F.3d 424, 434 (3d Cir. 2017).

The decedent's mental health history is set forth at some length in the amended complaint. Plaintiff avers that Defendants[2] "were aware of Denman's severe mental health issues," as his conviction at trial featured a finding that he was "guilty but mentally ill." (Id. ¶¶ 24–25.) In fact, prior to his time at SCI-Camp Hill, the decedent was incarcerated at the Luzerne County Correctional Facility ("LCCF"), where he was placed on extended suicide watch and involuntarily committed to the facility's psychiatric ward. (Id. ¶ 26.) Records from LCCF reflect that Denman attempted to harm himself several times, including twice tying a suicide smock around his neck, while also expressing a desire to die. (Id. ¶¶ 28–29.) LCCF records also show that Denman experienced "hallucinations, self-harm, and suicidal ideations [sic]." (Id. ¶ 30.)

On September 16, 2019, Denman underwent a mental health hearing during which Dr. Richard Fischbein ("Dr. Fischbein"), testified that he should be placed in a state prison with "intense psychiatric backup" due to "[his] suicidal ideations [sic]." (Id. ¶ 31.) Dr. Fischbein concluded that Denman suffered from hallucinations and paranoia, and further recommended that he be placed on suicide watch as a result of his mental health issues and overall fragility. (Id. ¶ 32.) Plaintiff maintains that "in his Initial Classification Summary in November 2019, Mr. Denman reported numerous suicide attempts since the age of eight (8), by inter alia, hanging." (Id. ¶ 33.) Denman was psychiatrically hospitalized in 2018 following a suicide attempt and

---

[2] Plaintiff initially listed John Wetzel, George Little, Laurel Henry, fictitious SCI-Camp Hill Correctional Officers John/Jane Does 1–10, MHM, Correct Care Solutions, LLC, and fictious Medical Providers John/Jane Does 1–10 as defendants in this case. (Doc. No. 1 at 1.) In her amended complaint, Plaintiff named the same defendants. (Doc. No. 25 at 1.) Subsequently, Plaintiff stipulated to the dismissal of John Wetzel, George Little, Laurel Henry (Doc. No. 44), and Correct Care Solutions, LLC (Doc. No. 50). Therefore, the only remaining defendants are MHM and the fictitious John and Jane Doe correctional officers and John and Jane Doe medical providers.

admitted to having suicidal thoughts in the summer of 2019.  (Id. ¶¶ 34–35.)  He received a

Mental Health Stability Rating of "D," which indicates that he had a "mental health history and

requires monitoring by the Psychiatric Review Team."  (Id. ¶ 36.)  At SCI-Camp Hill, Denman

was diagnosed with schizophrenia and prescribed Cogentin, Haldol, Depakote, and Remeron.[3]

(Id. ¶ 37.)  Plaintiff alleges that "[a]fter his original diagnosis of schizophrenia by the SCI-Camp

Hill psychiatrist, a nurse practitioner changed Mr. Denman's diagnosis to borderline personality

disorder."  (Id. ¶ 38.)  Plaintiff asserts that because the nurse practitioner was not a psychiatrist,

she was not equipped to make such a determination, yet she changed his diagnosis in the records

"without any documentation of the [sic] her assessment, justification, or reasoning."  (Id. ¶ 39.)

Plaintiff alleges that the change to the decedent's diagnosis "dr[o]v[e] [his] care throughout his

incarceration."  (Id. ¶ 40.)  Plaintiff asserts that despite evidence that Denman had an intellectual

disability, his treatment plan never considered his intellectual disability.  (Id. ¶ 41.)

Denman was transferred several times during his period of incarceration, and Plaintiff

maintains that he received psychiatric treatment at each of the facilities where he was detained.

---

[3]  Haldol is the common brand name for the medication haloperidol, which treats schizophrenia. See Haloperidol Tablets, Cleveland Clinic, https://my.clevelandclinic.org/health/drugs/19626-haloperidol-tablets (last visited Oct. 22, 2024). Cogentin is the common brand name of the medicine benztropine, which treats symptoms that affects one's movement and interacts with haloperidol.  See Benztropine tablets, Cleveland Clinic, https://my.clevelandclinic.org/health/drugs/19171-benztropine-tablets (last visited Oct. 22, 2024).  Depakote is the brand name for the medicine divalproex sodium, which prevents and controls seizures in people with epilepsy by calming overactive nerves in the body and treats bipolar disorder.  See Divalproex Sodium Sprinkle Capsules, Cleveland Clinic, https://my.clevelandclinic.org/health/drugs/18667-divalproex-sodium-sprinkle-capsules (last visited Oct. 22, 2024); see also Divalproex Sodium Delayed- or Extended- Release Tablets, Cleveland Clinic, https://my.clevelandclinic.org/health/drugs/18178-divalproex-sodium-delayed--or-extended-release-tablets (last visited Oct. 22, 2024) (bearing the common brand name Depakote as well).  Finally, Remeron is the common brand name for the medicine mirtazapine, which treats depression.  See Mirtazapine Tablets, Cleveland Clinic, https://my.clevelandclinic.org/health/drugs/18378-mirtazapine-tablets (last visited Oct. 22, 2024).

(Id. ¶¶ 42–43.)  Plaintiff alleges that "[a]ll facilities had access to Mr. Denman's mental health records from prior facilities."  (Id. ¶ 44.)  In his final period of detention at SCI-Camp Hill, he was placed in the special medical unit, also known as "Block J," although "there were no measures in place to stop the obvious and imminent threat of a suicide attempt."  (Id. ¶ 45.)

Less than one month before his death, on October 27, 2021, while on Block J, "Mr. Denman used a razor to cut a '2cm laceration [in]to [his] left forearm.'"  (Id. ¶ 46.)  During that incident, which occurred approximately one month prior to his death, Denman stated "that he wanted to slit his throat instead."  (Id. ¶ 47.)  Plaintiff alleges that "[w]hen asked how he could be helped, Mr. Denman replied that he did not know" but in spite of that, "he was discharged from the Psychiatric Observation cell just two (2) days later, on October 29, 2021, with recommendations stating only that Mr. Denman would 'be on razor restrictions.'"  (Id. ¶ 48.) Plaintiff asserts that Denman's "premature discharge from Psychiatric Observation was directly related to his unjustified diagnosis of borderline personality disorder wherein further treatment was felt to be counterproductive to his suicidal risk, rather than appropriate."  (Id. ¶ 49.)

Plaintiff alleges that "[d]espite a period of effective medication management, Mr. Denman's medications were changed due to an error in understanding laboratory value, potential side effects, and associated risks, specifically regarding neutropenia."  (Id. ¶ 50.)  Denman's mental health records "repeatedly note, inter alia, voices/hallucinations, suicidal ideations [sic], and medications not working."  (Id. ¶ 51.)  Plaintiff asserts that "[i]n fact, throughout this incarceration, Mr. Denman relayed on several occasions that voices instruct him to harm himself."  (Id. ¶ 52.)

Plaintiff alleges that "[d]espite Mr. Denman's well-documented and well-known mental health issues, Mr. Denman had access to a rug, which Defendants knew or should have known

could be used to construct a noose." (Id. ¶ 53.) She further asserts that "although Mr. Denman was mentally unstable and a high-risk for suicide, Defendants failed to check on him for an extended period of time." (Id. ¶ 54.) Denman was "able to deconstruct the rug and use the material to construct a noose to hang himself, which presumably [t]ook several hours at a minimum." (Id. ¶ 55.) Ultimately, on November 20, 2021, "Mr. Denman used the self-made noose to hang himself." (Id. ¶ 56.) Plaintiff asserts that "Defendants did not check on Denman until he was unresponsive in his cell." (Id. ¶ 57.) On November 20, 2021, at six (6) in the morning, correctional officers found Denman's body. (Id. ¶ 58.)

Plaintiff asserts that "Mr. Denman's suicide was far from an isolated incident." (Id. ¶ 59.) She states that Denman was "not the only suicide victim of SCI-Camp Hill," that "[t]he widespread prison suicide problem, far beyond SCI-Camp Hill, has been well publicized for years now," and that "[Defendants] were well aware of their failures to appropriately treat numerous prisoners like Mr. Denman suffering from mental illness." (Id. ¶¶ 60–62.) Moreover, Plaintiff alleges that "[n]ews articles pointed out that Mr. Denman's death was the fourth death at a county or state prison just within the eight (8) days preceding." (Id. ¶ 63.) Plaintiff further alleges that "despite numerous and repeated inmate suicides and suicide attempts over the years, Defendants failed to create, implement and/or enforce the necessary policies and customs to protect inmates of SCI-Camp Hill." (Id. ¶ 64.) Of those necessary policies and customs that Plaintiff alleges Defendants did not create, implement and/or enforce, she specifically points to Defendants' failure "to adhere to the Mission Statement stated on the D[epartment] O[f] C[orrections]'s website" (id. ¶ 65), and failure "to adhere to its own policy, D[epartment] O[f] C[orrections]Policy 13.8.1, related to mental health care" (id. ¶ 66).

### B.    Procedural Background

On November 17, 2023, Plaintiff initiated the instant action, asserting both federal and state law claims arising out of the death of her son, Ulysses Denman.  (Doc. No. 1.)  As noted supra at note 2, Plaintiff named as Defendants John Wetzel, then Secretary of the Department of Corrections for the Commonwealth of Pennsylvania, George Little, the subsequent Acting Secretary of the Department of Corrections for the Commonwealth of Pennsylvania, Laurel Harry, then Superintendent of SCI-Camp Hill (collectively with former Secretary Little and Wetzel "Government Official Defendants"), Correctional Officers John and Jane Does, who work at SCI-Camp Hill, MHM Correctional Services, LLC, d/b/a MHM Solutions, a contractor providing psychiatric and mental health services to the inmates at SCI-Camp Hill, Correct Care Solutions, LLC n/k/a Wellpath, LLC, a contractor providing mental health services to inmates at SCI-Camp Hill, and Medical Providers John and Jane Does, who are "doctors, nurses, specialists, or other medical providers working at SCI-Camp Hill." (Id. ¶¶ 11–17.)  Plaintiff's complaint asserted the following claims: (1) a civil rights claim pursuant to 42 U.S.C. § 1983, alleging that all Defendants violated Denman's Eighth Amendment rights; (2) a state law medical negligence claim against the Medical Provider Defendants;[4] (3) a wrongful death action against all Defendants; and (4) a survival action against all Defendants.  (Id. ¶¶ 49–73.)

On January 22, 2024, Defendant MHM filed a motion to dismiss the claims against it (Doc. No. 7) and filed a brief in support of that motion on February 5, 2024 (Doc. No. 8).  On February 19, 2024, Plaintiff filed an unopposed motion for an extension of time to respond to Defendant MHM's motion (Doc. No. 9), which the Court subsequently granted (Doc. No. 10),

---

[4] Plaintiff's complaint defined the "Medical Provider Defendants" as medical providers working at SCI-Camp Hill who were the employees and/or agents of the Pennsylvania Department of Corrections, Defendant MHM, or Defendant Correct Care.  (Doc. No. 1 ¶ 17.)

giving Plaintiff until April 19, 2024, to respond to Defendant MHM's motion.  On February 23, 2024, Defendants Correct Care and MHM submitted a "Notice of Intention to Enter Judgment of Non Pros for Failure to File a Certificate of Merit" (Doc. No. 6), citing Pennsylvania Rule of Civil Procedure 1042.7 in so doing.[5]  On March 7, 2024, the Government Official Defendants filed an unopposed motion for an extension of time to file an answer to Plaintiff's complaint. (Doc. No. 17.)  On March 8, 2024, the Court granted the Government Official Defendants' motion.  (Doc. No. 18.)  That same day, Defendant Correct Care filed a motion to dismiss Plaintiff's complaint (Doc. No. 19), and Plaintiff moved for an extension of time to respond to this motion (Doc. No. 20).  The Court granted Plaintiff's motion, giving Plaintiff until April 19, 2024, to respond to Defendant Correct Care's motion to dismiss.  (Doc. No. 21.)  On March 20, 2024, Defendant Correct Care filed a brief in support of its motion to dismiss.  (Doc. No. 22.) On April 5, 2024, the Government Official Defendants also filed a motion to dismiss (Doc. No. 23), and filed a brief in support of that motion ten days later (Doc. No. 24).

Subsequently, on April 19, 2024, Plaintiff filed an amended complaint.  (Doc. No. 25.)  In the amended complaint, Plaintiff asserts: (1) a civil rights claim pursuant to 42 U.S.C. § 1983

---

[5]  The text of the rule states, in relevant part, as follows:

> (a) The prothonotary, on praecipe of the defendant, shall enter a judgment of non pros against the plaintiff for failure to file a certificate of merit within the required time provided that (1) there is no pending motion for determination that the filing of a certificate is not required or no pending timely filed motion seeking to extend the time to file the certificate, (2) no certificate of merit has been filed, (3) except as provided by Rule 1042.6(b), the defendant has attached to the praecipe a certificate of service of the notice of intention to enter the judgment of non pros, and(4) except as provided by Rule 1042.6(b), the praecipe is filed no less than thirty days after the date of the filing of the notice of intention to enter the judgment of non pros.

See Pa. R. Civ. P. 1042.7.

against all Defendants (id. at 13); (2) a medical negligence claim against the "Medical Provider Defendants"[6] (id. at 18); (3) a wrongful death action against all Defendants (id. at 21); and (4) a survival action against all Defendants (id. at 22).  Plaintiff then filed a motion for an extension of time to respond to Defendant MHM's motion to dismiss her initial complaint.  (Doc. No. 26.) The Court granted Plaintiff's motion for an extension (Doc. No. 27), and on May 2, 2024, Defendant MHM filed an unopposed motion for an extension of time to respond to Plaintiff's amended complaint (Doc. No. 28).  That same day, the Court granted Defendant MHM's motion, giving Defendant MHM until June 3, 2024, to respond to Plaintiff's amended complaint.  (Doc. No. 30.)  On May 10, 2024, Defendant Correct Care filed a motion to dismiss Plaintiff's amended complaint (Doc. No. 31) and filed a brief in support of its motion ten (10) days later (Doc. No. 32).

On May 22, 2024, to resolve the parties' apparent uncertainty regarding which complaint was the operative complaint in this matter, the Court issued an Order deeming Plaintiff's amended complaint filed and instructing all Defendants to respond to the amended complaint by June 3, 2024.  (Doc. No. 33.)  On June 3, 2024, Defendant MHM and the Government Defendants each filed motions to dismiss the amended complaint.  (Doc. Nos. 34, 35.)  On June 17, 2024, Defendant MHM and the Government Official Defendants filed briefs supporting their respective motions to dismiss.  (Doc. Nos. 36, 37.)  On June 24, 2024, Plaintiff filed two unopposed motions to extend the time she would have to respond to Defendant MHM and the Government Official Defendants' respective motions to dismiss (Doc. Nos. 38, 39), and the

---

[6]  Plaintiff's amended complaint defines the "Medical Provider Defendants" as "doctors, nurses, specialists, or other medical providers working at SCI-Camp Hill as employees and/or agents" of the Department of Corrections, Defendant MHM, or Defendant Correct Care.  (Doc. No. 25 ¶ 17.)

Court subsequently granted these motions (Doc. No. 40).  Plaintiff then filed an unopposed motion for an extension of time to respond to Defendant Correct Care's motion to dismiss.  (Doc. No. 41.)  On July 8, 2024, the Court granted this motion.  (Doc. No. 42.)  On July 29, 2024, Plaintiff filed a Stipulation of Dismissal as it pertains to the Government Official Defendants. (Doc. No. 43.)  On July 30, 2024, the Court issued an Order approving the stipulation, denying the Government Official Defendants' motion to dismiss as moot, and instructing the Clerk of Court to terminate each of the Government Official Defendants from this case.  (Doc. No. 44.) On July 31, 2024, Plaintiff filed a brief opposing Defendant MHM's motion to dismiss her amended complaint.  (Doc. No. 46.)  On August 14, 2024, Defendant MHM filed a reply brief in further support of its motion to dismiss Plaintiff's amended complaint.  (Doc. No. 47.)

On August 16, 2024, Plaintiff and Defendant Correct Care filed a joint stipulation dismissing Plaintiff's Section 1983 claim against Defendant Correct Care.  (Doc. No. 48.)  On August 19, 2024, the Court approved that stipulation, dismissing Plaintiff's Section 1983 claim, without prejudice, only as it pertains to Defendant Correct Care.  (Doc. No. 49.)  On August 30, 2024, Plaintiff and Defendant Correct Care filed a joint stipulation dismissing Correct Care Solutions, LLC from this case without prejudice.  (Doc. No. 50.)  Accordingly, the only Defendants remaining in this case are Defendant MHM and Defendants John and Jane Doe Correctional Officers and John and Jane Doe Medical Providers.  Having been fully briefed, Defendant MHM's motion to dismiss Plaintiff's amended complaint is ripe for resolution.

## II.     LEGAL STANDARD

Federal notice and pleading rules require the complaint to provide the defendant notice of the claim and the grounds upon which it rests.  See Phillips v. County of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008).  The plaintiff must present facts that, accepted as true, demonstrate a

plausible right to relief.  <u>See</u> Fed. R. Civ. P. 8(a).  Although Federal Rule of Civil Procedure 8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled to relief," a complaint may nevertheless be dismissed under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted."  <u>See</u> Fed. R. Civ. P. 12(b)(6).

When ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and all reasonable inferences that can be drawn from them, viewed in the light most favorable to the plaintiff.  <u>See</u> <u>In re Ins. Brokerage Antitrust Litig.</u>, 618 F.3d 300, 341 n.42 (3d Cir. 2010) (citations omitted).  The Court's inquiry is guided by the standards of <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007), and <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009).  Under <u>Twombly</u> and <u>Iqbal</u>, pleading requirements have shifted to a "more heightened form of pleading."  <u>See</u> <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210 (3d Cir. 2009).  To prevent dismissal, all civil complaints must set out "sufficient factual matter" to show that the claim is facially plausible.  <u>See</u> <u>id.</u>  The plausibility standard requires more than a mere possibility that the defendant is liable for the alleged misconduct.  As the Supreme Court instructed in <u>Iqbal</u>, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  <u>See</u> <u>Iqbal</u>, 556 U.S. at 679 (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

Accordingly, to determine the sufficiency of a complaint under <u>Twombly</u> and <u>Iqbal</u>, the United States Court of Appeals for the Third Circuit ("Third Circuit") has identified the following steps a district court must take under Rule 12(b)(6): (1) identify the elements a plaintiff must plead to state a claim; (2) identify any conclusory allegations contained in the

complaint "not entitled" to the assumption of truth; and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief." See Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (quoting Iqbal, 556 U.S. at 679).

In ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." See Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

## III.    DISCUSSION

As noted supra, Plaintiff's amended complaint asserts a Section 1983 claim, a medical negligence claim, and wrongful death survival claim against Defendant MHM and Defendants John and Jane Doe correctional officers and John and Jane Doe medical providers. Defendant MHM argues for dismissal of Plaintiff's Section 1983 claim and medical negligence claim.[7] The Court first addresses the pending motion to dismiss Plaintiff's Section 1983 claim before evaluating the motion as to Plaintiff's medical negligence claim.

---

[7] Defendant MHM also argues in favor of dismissing Plaintiff's survival and wrongful death claims asserted against it. (Doc. Nos. 36 at 9; 37 at 11.) However, pursuant to Pennsylvania law, "wrongful death and survival actions are not substantive causes of action; rather, they provide a vehicle through which plaintiffs can recover for unlawful conduct that results in death." See Johnson v. City of Philadelphia, 105 F. Supp. 3d 474, 483 (E.D. Pa. 2015) (citation omitted), aff'd, 837 F.3d 343 (3d Cir. 2016). Accordingly, dismissal of these counts is only warranted to the extent that the Court dismisses the Section 1983 and medical negligence claims asserted against Defendant MHM.

**A.    Plaintiff's § 1983 Claim**

**1.    Legal Standard**

Section 1983 is the vehicle by which private citizens can seek redress for violations of federal constitutional rights committed by state officials.  See 42 U.S.C. § 1983.  The statute provides, in relevant part, as follows:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

See id.  Section 1983 "does not . . . create substantive rights; it provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws."  See Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  To state a claim for relief under Section 1983, a plaintiff "must allege the violation of a right secured by the Constitution and laws of the United States" and "show that the alleged deprivation was committed by a person acting under color of state law."  See Harvey v. Plains Twp. Police Dep't, 421 F.3d 185, 189 (3d Cir. 2005) (quoting West v. Atkins, 487 U.S. 42, 48 (1988)).

In this case, Plaintiff asserts that Defendant MHM violated the Eighth Amendment rights of her son insofar as it failed to prevent his suicide at SCI-Camp Hill.  The Eighth Amendment to the United States Constitution "prohibits prison officials from being deliberately indifferent to an inmate's serious medical needs."  See Palakovic v. Wetzel, 854 F.3d 209, 227 (3d Cir. 2017) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).  The Third Circuit summarized the standard applicable to deliberate indifference claims against prison officials relating to failure to prevent suicide as follows:

> When a plaintiff seeks to hold a prison official liable for failing to prevent a detainee's suicide…a plaintiff must show: (1) that the individual had a particular vulnerability to suicide, meaning that there was a "strong likelihood, rather than a mere possibility," that a suicide would be attempted; (2) that the prison official knew or should have known of the individual's particular vulnerability; and (3) that the official acted with reckless or deliberate indifference, meaning something beyond mere negligence, to the individual's particular vulnerability.

Id. at 223–24 (citation omitted).

As to the first element—the detainee's particular vulnerability to suicide—a plaintiff must plead facts informing the Court of "the degree of risk inherent in the detainee's condition." See Palakovic, 854 F.3d at 222. More specifically, "there must be 'a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur.'" See Colburn v. Upper Darby Twp., 946 F.2d 1017, 1024 (3d Cir. 1991) (citations omitted). "[A] detainee's strong likelihood of suicide must be so obvious that a lay person would easily recognize the necessity for preventative action." Palakovic, 854 F.3d at 222 (internal quotations omitted). The second element, requiring the claimant to plead that the custodial officer knew or should have known of the prisoner's vulnerability to suicide, combines with the third element, requiring prison officials to have acted with reckless or deliberate indifference to a prisoner's particular vulnerability to suicide, to create "a relatively high level of culpability on the part of prison officials before holding them accountable." See id. (citing Colburn, 946 F.2d at 1024–25). Such a high culpability means that officials should act with "something beyond mere negligence." See id.

Private contractors who operate in state run prison facilities cannot be held liable under any theory of respondeat superior or vicarious liability for the acts of their employees. See Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 583 (3d Cir. 2003) (citing Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 691 (1978)). Rather, a plaintiff "must allege a policy or custom that resulted in the alleged constitutional violations at issue" in order "to state a

claim against a private corporation providing medical services under contract with a state prison system." <u>See</u> <u>Palakovic</u>, 854 F.3d at 232 (citing <u>Natale</u>, 318 F.3d at 583–84); <u>Monell</u>, 436 U.S. at 691.

2.  <b>Arguments of the Parties</b>

In arguing that Plaintiff's Section 1983 claim should be dismissed, Defendant MHM first asserts that Plaintiff's amended complaint contains no facts suggesting that Denman "exhibited a particular vulnerability to suicide during his incarceration and the months leading up to his death." (Doc. No. 36 at 5.) Defendant MHM maintains that, even considering that Plaintiff's amended complaint discusses prior attempts at self-harm and suicidal ideation, courts from this circuit have held that such facts do not establish that the Decedent exhibited a particular vulnerability to suicide. (<u>Id.</u>) Defendant MHM cites <u>Hinton v. United States</u> for the proposition that prior suicide attempts over an extended period are not sufficient to establish the decedent's particular vulnerability to suicide. (<u>Id.</u> (citing <u>Hinton v. United States</u>, No. 14-cv-00854, 2015 WL 737584 (M.D. Pa. Feb. 20, 2015).) Defendant MHM also cites <u>Baez v. Lancaster County</u>, in which a panel of the Third Circuit held, in a non-precedential opinion, that an inmate's suicidal ideation several weeks prior to committing suicide was not sufficient to establish a vulnerability to suicide such that a layperson would recognize it. (Doc. No. 36 at 5–6 (citing <u>Baez v. Lancaster Cty.</u>, 487 F. App'x 30, 31 (3d Cir. 2012) (unpublished)).) Defendant MHM argues that the facts in Plaintiff's amended complaint are too conclusory and bare to plausibly allege that Plaintiff's decedent had a particular vulnerability to suicide. (Doc. No. 36 at 6.)

Further, Defendant MHM argues that Plaintiff must assert that some policy or custom resulted in the alleged constitutional deprivation and maintains that Plaintiff's amended complaint does not allege a policy or custom that it could have implemented which would have

14

put officials on notice as to Denman's vulnerability to suicide.  (Id. at 6–7.)  Defendant MHM

asserts that, because Denman did not exhibit a vulnerability to suicide, Plaintiff cannot point to

any policies that would have enabled it to prevent his tragic death.  (Id. at 7.)

In response, Plaintiff first maintains that, unlike in Hinton and Baez, she sufficiently

pleaded facts indicating that her decedent had a significant history of suicidal ideation, namely in

the period immediately preceding his death, which was known to Defendant MHM's employees.

(Doc. No. 46 at 9.)  More specifically, Plaintiff asserts that her amended complaint alleges that

Denman was wrongly discharged from psychiatric observation, and his suicide followed shortly

thereafter.  (Id. at 10.)  Plaintiff argues that the facts reveal Denman's "particular vulnerabilities

and previously demonstrated willingness to suffer through the slow death that is self-

strangulation."  (Id.)  Plaintiff then reiterates that Denman's records from LCCF, as well as SCI-

Camp Hill, reveal several instances where he professed a desire to end his own life or physically

hurt himself.  (Id. at 10–11.)  Plaintiff asserts that Denman was placed under psychiatric

observation by Defendant MHM, and that Defendant MHM's discharge instruction that he

should be kept from using a razor was wholly inadequate to address his well-documented

propensities for self-harm.  (Id. at 11.)  Plaintiff maintains that Defendant MHM's failure to

recommend more intensive monitoring following Denman's discharge from psychiatric

observation is indicative of Defendant MHM's inadequate care.  (Id.)  Plaintiff asserts that her

amended complaint clearly explains how Defendant MHM's failure to implement or apply

Department of Corrections ("DOC") policies regarding potentially self-destructive individuals is

the policy failure that makes it liable under Section 1983.  (Id. at 12–13.)  Finally, Plaintiff

requests, in the alternative, leave to amend to file a second amended complaint in the event the

Court concludes that her Section 1983 claim is subject to dismissal.  (Id. at 16.)

### 3. Whether Defendant MHM Is Entitled to Dismissal of Plaintiff's Section 1983 Claim

Upon careful consideration of the amended complaint, the parties' briefs, and relevant authority, the Court finds that Plaintiff's amended complaint fails to plausibly allege a Section 1983 Eighth Amendment vulnerability to suicide claim against Defendant MHM.  The Court first discusses the three prongs of the Palakovic vulnerability to suicide test before addressing the custom or policy requirement of Monell.

#### a. Particular Vulnerability to Suicide

Under Palakovic, Plaintiff must plead "the degree of risk inherent in the detainee's condition."  See Palakovic, 854 F.3d at 222.  Plaintiff does so via a chronology of Denman's mental health history as told through his mental health records from the correctional facilities.  In the amended complaint, Plaintiff explains that the decedent reported in his Initial Classification Summary that he made numerous suicide attempts since the age of eight (8).  (Doc. No. 25 ¶ 33.)  While confined to pre-trial detention in Luzerne County, Denman was placed on extended suicide watch and was involuntarily committed to the psychiatric ward.  (Id. ¶ 26.)  Plaintiff further asserts that those records from county jail also record Denman's statements regarding hallucinations and suicidal ideation and overtures towards committing suicide (e.g., tying an anti-suicide smock around his neck twice).  (Id. ¶¶ 28–30.)  The amended complaint also alleges that in 2019, Denman had an initial mental health hearing, at which a forensic psychologist testified that Denman suffered from paranoia and hallucinations (id. ¶ 32), recommended that Denman be placed on suicide watch (id.), and concluded that Denman needed a "state prison that has very secure and intense psychiatric backup" (id. ¶ 31).  Plaintiff further alleges in her amended complaint that Denman's Mental Health Stability Rating was set as a "D-rating" which meant that he had a mental health history and required significant monitoring (although there is

16

no indication of when this rating was determined). (Id. ¶ 36.) Plaintiff asserts that the mental health records of Denman repeatedly note that he suffered from auditory and visual hallucinations, suicidal ideation, and ineffective medication. (Id. ¶ 51.) The amended complaint alleges that Denman's records detail several occasions where he described voices in his head instructing him to harm himself. (Id. ¶ 52.) It also asserts that two years later, Denman attempted suicide in October 2021 by laceration with a razor. (Id. ¶ 46.) The same day of the incident, Denman stated that he wanted to use the razor to slit his throat instead. (Id. ¶ 47.) In short, Plaintiff has pleaded facts alleging that Denman displayed suicidal ideation and mental ill-health from at least 2018 through 2019 and that in 2021 those suicidal thoughts persisted and culminated in an unsuccessful suicide attempt as well as statements that he wanted to escalate his attempts to take his own life.

Defendant MHM points to Hinton, 2015 WL 737584, and Baez, 487 F. App'x 30, in support of its position that the facts pleaded are insufficient to support a plausible inference of a particular vulnerability to suicide. (Doc. No. 36 at 6.) The Court, however, finds these cases distinguishable. In Hinton, the plaintiff alleged: (1) that decedent made three suicide attempts in January, February, and March of 2001; (2) that decedent was moved from his first corrections facility to the Federal Corrections Institution in Allenwood, Pennsylvania as a result of the suicide attempts; (3) that decedent had a persistent depression diagnosis that was managed by medication; and (4) that decedent ultimately committed suicide in January of 2012. See Hinton, 2015 WL 737584, at *2–*3. In Baez, the plaintiff alleged: (1) that decedent expressed suicidal ideation to a security officer while en route to the medical unit; (2) that decedent was evaluated by psychiatrists and determined to not be at risk of suicide; (3) that decedent stayed a week in the medical unit under suicide watch; (4) that decedent was discharged after showing signs of

improvement and an evaluation by a psychologist; and (5) that decedent made no suicide attempt while incarcerated.  See Baez, 487 F. App'x at 31.

These cases are distinguishable from Denman's situation.  Whereas the decedent in Hinton made three suicide attempts eleven years prior to his eventual suicide, see Hinton, 2015 WL 737584, at *2–3, and the decedent in Baez made no prior suicide attempts prior to his eventual suicide, see Baez, 487 F. App'x at 31, the amended complaint here alleges that Denman had a long history of suicide attempts (Doc. No. 25 ¶¶ 28–30, 33), and his successful suicide attempt came just twenty-four (24) days after an unsuccessful suicide attempt (id. ¶¶ 46–47, 56). The amended complaint further asserts that Denman's time in incarceration—from his time in county jail until his last days in SCI-Camp Hill—was in large part marred by issues with his mental health and documented ineffectiveness of medications.  (Id. ¶¶ 24–56.)  That stands in stark contrast with Hinton, in which that decedent spent nearly a decade responding well to medication and having little, if any, indication of suicidal ideation.  See Hinton, 2015 WL 737584, at *2–3.  After Hinton, Baez is also inapplicable.  In that case the decedent mentioned having suicidal ideation, was placed under observation for a week, had an evaluation by a psychiatrist, and was determined fit to return to general population before committing suicide. See Baez, 487 F. App'x at 31.  The amended complaint plausibly alleges a "strong likelihood, rather than a mere possibility, that self-inflicted harm [would] occur."  See Woloszyn v. County of Lawrence, 396 F.3d 314, 320 (3d Cir. 2005) (quoting Colburn, 946 F.2d at 1024).  Thus, Plaintiff's amended complaint satisfies the first prong of the Palakovic test, and the Court turns to the second prong.

### b.    Knowledge of Particular Vulnerability to Suicide

Upon careful review of the amended complaint, the parties' arguments, and relevant authority, the Court finds that the amended complaint plausibly alleges that MHM officials knew or should have known, that Denman had a particular vulnerability to suicide.  See Palakovic, 854 F.3d at 222–23 (explaining that courts have interpreted the Colburn high culpability standard of deliberate indifference as knowledge).  As explained supra, the allegations of Plaintiff's amended complaint establish that the decedent's mental health issues and history of suicidal ideation at LCCF were recorded in his prison records.  (Doc. No. 25 ¶¶ 27–36.)  Plaintiff alleges that Denman's prison record memorializes his mental health issues, psychiatric diagnoses (and the changes to those diagnoses), suicidal ideation, and psychiatric treatment across the multiple facilities in which Denman resided.  (Id. ¶¶ 37–45, 51.)  Of particular note, the amended complaint asserts that "all facilities had access to Denman's mental health records from prior facilities."  (Id. ¶ 44.)  In fact, MHM's employees at SCI-Camp Hill recognized decedent's mental health issues and acted upon that knowledge by placing him in the special medical unit "Block J," diagnosing him first with schizophrenia, re-diagnosing him subsequently with bipolar disorder, and placing him on medications.  (Id. ¶¶ 37–39, 45.)  Thus, the amended complaint alleges a lengthy mental health history of the decedent that prison and MHM staff recorded and acted upon.

As in Palakovic, where the Third Circuit found that the amended complaint sufficiently established the second prong because it contained allegations that the officials knew that the decedent had attempted suicide on prior occasions, identified the decedent as a "suicide behavior risk," rated him a "D" as to his mental stability, diagnosed him with multiple serious mental illnesses, and placed him on a mental health roster, this amended complaint details knowledge of

the decedent's risk of suicide.  See Palakovic, 854 F.3d at 230.  The amended complaint reveals

Denman's extensive mental health history that includes prior instances of self-harm (Doc. No. 25

¶ 29), suicide attempts and suicidal ideation before and during his confinement (id. ¶¶ 26–30,

33–35), a "D" rating for mental health stability (id. ¶ 36), diagnoses of schizophrenia and

borderline personality disorder (id. ¶¶ 37–38), and placement in the special medical unit (id. ¶

45).  See Palakovic, 854 F.3d at 226; see also Diorio v. Harry, No. 21-1416, 2022 WL 3025479,

*4–5 (3d Cir. Aug. 1, 2022) (unpublished) (highlighting the "stronger factual support of"

Palakovic's case that showed past suicide attempts, low stability rating, multiple mental illness

diagnoses, and placement on a mental health roster).  Taking those factual allegations as true, the

Court finds that the amended complaint plausibly alleges the knowledge prong of the Palakovic

test.  The Court next considers whether the factual allegations in the amended complaint, taken

as true, plausibly allege that MHM acted with deliberate indifference towards Denman and his

known particular vulnerability to suicide.

### c.    Deliberate Indifference to Particular Vulnerability to Suicide

Upon careful consideration of the amended complaint, the parties' briefs, and relevant

authority, the Court concludes that the amended complaint plausibly alleges deliberate

indifference by Defendant MHM to Denman's particular vulnerability to suicide.  MHM

provided medical care to Denman in the form of psychiatric evaluation, diagnosis, and

treatment.[8]  (Doc. No. 25 ¶ 37.)  The amended complaint asserts that Denman was diagnosed

with schizophrenia and was prescribed Cogentin, Haldol, Depakote, and Remeron.  (Id.)

---

[8]   The Court observes that the amended complaint indicates that MHM provides psychiatric and
mental health services to inmates in Pennsylvania state correctional institutions.  (Doc. No. 25 ¶
15.)  Therefore, the Court shall consider only the averred psychiatric and mental health services
provided to Denman at state correctional institutions as actions performed by MHM through its
employees.

Plaintiff further alleges that Denman's diagnosis was changed by a psychiatric nurse practitioner rather than a psychiatrist.  (Doc. No. 25 ¶ 39.)  Plaintiff also claims that MHM's employees misread Denman's laboratory results which led to a change in his medications.  (Doc. No. 25 ¶ 50.)  Those alleged facts on their own may not reach the "relatively high level of culpability" required by <u>Palakovic</u>, <u>see</u> <u>Palakovic</u>, 854 F.3d at 222, but the amended complaint also alleges that, after decedent's October 27, 2021 suicide attempt, he was placed in psychiatric observation for only two (2) days.  (<u>Id.</u> ¶ 48.)  At that time, Denman stated that he wanted to slit his throat instead of his left forearm, yet he was continued under psychiatric observation for only two (2) days.  (<u>Id.</u> ¶¶ 46–48.)  Despite the fact that Defendant MHM's employees asked Denman how he could be helped, and he stated that he did not know, he was released back to his cell after only two (2) days of observation.  (<u>Id.</u> ¶ 48.)  Upon his release from the psychiatric observation cell, Denman was placed back in the same cell block where he previously attempted suicide with no restrictions other than on razors and was allowed access to a rug and the time to deconstruct it.  (<u>Id.</u> ¶¶ 48, 53–55.)  The Court concludes that these factual allegations plausibly show that MHM's employees acted with deliberate indifference because they failed to take steps to ensure that Denman could not commit suicide.  Accordingly, the Court finds that the amended complaint plausibly alleges a violation of Denman's rights under Section 1983.  The Court turns to an assessment of whether the amended complaint plausibly alleges a policy or custom of Defendant MHM that resulted in the alleged constitutional violations.

**d.      Liability of a Private Entity under Section 1983**

As noted <u>supra</u>, for Plaintiff to hold Defendant MHM liable for a violation of Denman's constitutional rights, she must show that an official policy or custom of Defendant MHM resulted in the alleged constitutional violation.  <u>See</u> <u>Palakovic</u>, 854 F.3d at 232 (citing <u>Natale</u>,

318 F.3d at 583–84) ("To state a claim against a private corporation providing medical services under contract with a state prison system, a plaintiff must allege a policy or custom that resulted in the alleged constitutional violations at issue.").  According to the amended complaint, Plaintiff alleges that Defendants collectively had policies or customs that led to Denman's suicide as can be inferred from the following sources: the May 31, 2013 Department of Justice report (hereinafter "DOJ Report") on the issues of inadequate mental healthcare and systemic deficiencies at SCI-Cresson which found systemwide DOC policies that failed prisoners who were in need of mental health treatment; the February 2014 DOJ letter to the Governor of Pennsylvania on DOC statewide policies that found discrimination against inmates with serious mental health issues; the lawsuits against Defendants relating to suicide; and a Philadelphia Inquirer news article that published DOC statistics on suicide rates particularly in the years between 2008 and 2019.  (Id. ¶ 21.)  Plaintiff further alleges that, according to those sources: between the years 2008 and 2018, the rate of suicides in Pennsylvania state prisons doubled; in 2019, there were nineteen (19) inmate suicides in the DOC system (three (3) of which were suicides by hanging at SCI-Camp Hill); and in 2018, DOC recognized the increasing suicide problem and reviewed its then-existing policies and practices, but as of November 2021, no significant changes to those policies had been made.  (Id. ¶¶ 21–22.)

Plaintiff broadly attributes the amended complaint's factual allegations relating to policies or customs of DOC to all Defendants without providing factual allegations that support MHM's responsibilities for these policies.  The amended complaint states that the DOJ Report and the February 2014 letter to the Governor of Pennsylvania pertained to SCI-Cresson and systemwide issues at DOC facilities.  (Id. ¶ 21 (emphasis added).)  Taking those allegations as true, the potential harm-causing policies and customs that Plaintiff cites from the referenced DOJ

Report and the February 2014 DOJ letter to the Governor of Pennsylvania are attributed to SCI-Cresson and DOC facilities, not Defendant MHM.  Moreover, the amended complaint asserts suicide statistics as evidence of an alleged policy or custom but, without allegations of Defendant MHM's policies or customs, the Court can only conclude that suicides happen at DOC facilities, including SCI-Camp Hill, with no context to determine how those suicides relate to the actions, policies, or customs of Defendant MHM.  The factual allegations of the amended complaint stand in contrast to the factual allegations against Defendant MHM in the amended complaint of Palakovic.

In Palakovic, the plaintiffs' amended complaint asserted that MHM "was responsible for under-staffing psychiatric staff, not providing necessary forms of mental health treatment such as suicide risk assessments and counseling, failing to ensure adequate frequency of mental health appointments … and failing to provide proper medical oversight of medication regimes."  See Palakovic, 854 F.3d at 232 (citations omitted).  Moreover, the Palakovic plaintiffs alleged in their amended complaint that the DOJ Report on the inadequacies of mental health treatment at DOC facilities specifically found that "the mental health care provided by SCI-Cresson during the time of [the decedent's] incarceration suffered serious problems including a dearth of mental health treatment, insufficient staffing, and poor screening and diagnostic procedures."  See id.  Because the decedent in Palakovic was an inmate at SCI-Cresson during the time covered by the DOJ report, those alleged facts about the mental health treatment at the facility support plaintiffs' pleaded facts about the policies and customs that led to the decedent's suicide.  See id. Therefore, the Third Circuit held that the Palakovic amended complaint plausibly alleged facts to support the claim that Defendant MHM had a policy or custom that led to the decedent's suicide. See id.

In this case, however, Plaintiff, in her amended complaint, asserts neither specific allegations of MHM's policies or customs nor allegations of general conduct of MHM's staff at SCI-Camp Hill from which the Court could plausibly infer a policy or custom. Furthermore, although Plaintiff references the DOJ Report in the amended complaint, the report does not specifically refer to SCI-Camp Hill. Therefore, absent factual allegations of a policy or custom of Defendant MHM, Plaintiff fails to allege facts to plausibly state a claim that Defendant MHM is liable for the alleged deliberate indifference of its employees to Denman's vulnerability to suicide. Accordingly, because Plaintiff's amended complaint fails to plead facts plausibly alleging a constitutional violation caused by Defendant MHM's policy or custom, as required to state a Section 1983 deliberate indifference claim against Defendant MHM, the Court will grant Defendant MHM's motion to dismiss Plaintiff's Section 1983.

e.    **Leave to Amend**

As noted <u>supra</u>, Plaintiff requests that the Court grant her leave to amend her amended complaint in the event the Court concludes that her Section 1983 claim is subject to dismissal. (Doc. No. 46 at 16.) District courts must generally extend plaintiffs an opportunity to amend a complaint before dismissal of civil rights claims, unless doing so would be inequitable or futile. <u>See</u> <u>Fletcher-Harlee Corp. v. Pote Concrete Contractors</u>, 482 F.3d 247, 253 (3d Cir. 2007). Despite the fact that Plaintiff has amended her complaint once in response to the filing of motions to dismiss, this is the first time Plaintiff has received guidance from the Court as to what is required to state a Section 1983 policy or custom claim against Defendant MHM. Accordingly, the Court will grant Defendant MHM's motion to dismiss and provide Plaintiff the opportunity to file a second amended complaint in an attempt to state such a claim.

B.    **Plaintiff's State Law Medical Negligence, Wrongful Death, and Survival Action Claims**

In light of the Court's resolution of Defendant MHM's motion to dismiss Plaintiff's Section 1983 claims (Count I), there is currently no viable federal claim before the Court supporting the exercise of supplemental jurisdiction over Plaintiff's state law negligence, wrongful death, and survival action claims (Counts II, III, IV).  See Plasko v. City of Pottsville, 852 F. Supp. 1258, 1267 (E.D. Pa. 1994) (first citing United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966); and then citing Weaver v. Marine Bank, 683 F.2d 744, 746 (3d Cir. 1982)) ("Courts should ordinarily decline to exercise supplemental jurisdiction over state law claims when the federal claims are dismissed.").  Accordingly, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims asserted in Counts II, III, and IV and will dismiss those counts without prejudice to Plaintiff's ability to reassert the claims in a second amended complaint in this Court, or in state court if no amended complaint is filed in this Court.

IV.    **CONCLUSION**

For the foregoing reasons, the Court will grant MHM's motion to dismiss (Doc. No. 34) and will grant Plaintiff leave to file a second amended complaint that attempts to correct the pleading deficiencies identified herein.  An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania