IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ELEANOR DENMAN,** | : | |
| **both individually and as Administrator** | : | **No. 1:23-cv-01918** |
| **of the Estate of Ulysses Denman,** | : | |
| **Plaintiff** | : | **(Judge Kane)** |
| | : | |
| **v.** | : | |
| | : | |
| **MHM CORRECTIONAL SERVICES,** | : | |
| **LLC d/b/a MHM SOLUTIONS, <u>et al.</u>,** | : | |
| **Defendants** | : | |

**<u>MEMORANDUM</u>**

Before the Court is Defendants MHM Correctional Services LLC, d/b/a MHM Solutions

("MHM"), Saiqa Mushtaq, M.D. ("Mushtaq"), and Kevin Wanga, CRNP ("Wanga") (collectively

"MHM Defendants")' motion to dismiss (Doc. No. 65) Plaintiff Eleanor Denman ("Plaintiff")'s

second amended complaint (Doc. No. 54).  For the reasons that follow, the Court will grant in

part and deny in part the motion to dismiss.

I.      BACKGROUND

A.      Factual Background[1]

Plaintiff is the administrator of the Estate of her deceased son, Ulysses Denman

("Denman" or "Decedent"), who committed suicide while incarcerated at the State Correctional

Institution in Camp Hill, Pennsylvania ("SCI Camp Hill").  (Doc. No. 54 ¶ 25.)  At all relevant

times, Defendant MHM, the employer of Defendants Mushtaq and Wanga, was under contract

with the Pennsylvania Department of Corrections ("DOC") to provide psychiatric, medical, and

---

[1]  The factual background is drawn from Plaintiff's second amended complaint (Doc. No. 54),
the allegations of which the Court accepts as true for purposes of the pending motion to dismiss.
<u>See</u> <u>Kedra v. Schroeter</u>, 876 F.3d 424, 434 (3d Cir. 2017).

mental health services to inmates at Pennsylvania State Prisons, including SCI Camp Hill. (Id. ¶ 28.) Defendant Mushtaq is a medical doctor working at SCI Camp Hill, and the supervising physician of Defendant Wanga. (Id. ¶ 32.) Defendant Wanga, also working at SCI Camp Hill, is a certified registered nurse practitioner specializing in psychiatric care. (Id. ¶ 29.)

Denman was transferred to SCI Camp Hill in November of 2019 after being found guilty but mentally ill (GBMI) of the crime for which he was incarcerated. (Id. ¶¶ 47, 52.) Prior to his incarceration at SCI Camp Hill, Denman was jailed at a Luzerne County Correctional Facility ("LCCF"), where he was placed on extended suicide watch and involuntarily committed to the facility's psychiatric ward. (Id. ¶ 53.) Records from LCCF reflect that Denman exhibited "acting out behaviors" and used suicidal gestures when emotionally unstable. (Id. ¶ 54.) Denman frequently required restraints to prevent him from banging his head against walls and purposely injuring himself to write on his cell wall with his own blood. (Id. ¶¶ 48–50.) On at least one occasion, he attempted to harm himself because "he wanted something to do because he is extremely bored and […] hurting himself gives him something to do." (Id. ¶ 55.) On a separate occasion he tied a suicide prevention gown around his neck claiming that his depression was getting the best of him, and that he wanted to die. (Id. ¶ 56.) Plaintiff avers, upon information and belief, that SCI Camp Hill was well aware of Denman's need for extensive mental health services and his prior attempts at self-strangulation while at LCCF, as the latter records extensively note "Mr. Denman's hallucinations, self-harm, and suicidal ideation." (Id. ¶¶ 51, 57.)

On September 16, 2019, Denman underwent a mental health hearing during which Dr. Richard Fischbein ("Dr. Fischbein"), a forensic psychiatrist, testified that Denman should be placed in a state prison with "very secure and intense psychiatric backup" due to "[his] suicidal

ideations [sic]." (Id. ¶ 58.) Dr. Fischbein concluded that Denman suffered from paranoia and hallucinations and strongly recommended that he be placed on suicide watch while in prison and "watched carefully" as he was "still very fragile." (Id. ¶ 59.)

During an Initial Classification Summary completed in November of 2019 when Denman first arrived at SCI Camp Hill, Denman reported numerous suicide attempts since the age of eight (8) by, inter alia, hanging. (Id. ¶ 60.) Denman also admitted to experiencing suicidal thoughts just two months prior to arrival at SCI Camp Hill, in September 2019, and to having been psychiatrically hospitalized in 2018, "when he was '302'd' by police after a suicide attempt." (Id. ¶¶ 61–62.) Denman received a Mental Health Stability Rating "D," indicating that he had a "mental health history and requires significant monitoring by the Psychiatric Review Team." (Id. ¶ 63.) An SCI Camp Hill psychiatrist further diagnosed Denman with Schizophrenia, and prescribed him Cogentin, Haldol, Depakote, and Remeron. (Id. ¶ 64.) Denman was accordingly housed at SCI Camp Hill's residential treatment unit, Block J, where Plaintiff alleges "there were no/deficient measures in place to stop the obvious and imminent threat of a suicide attempt." (Id. ¶ 65.)

Plaintiff avers that on September 1, 2021, Denman was transferred back to LCCF due to an erroneously entered writ. (Id. ¶ 67.) While there, Plaintiff alleges that Denman received a change in medication and was placed on suicide watch after ripping his sheets, "likely to strangle himself." (Id. ¶¶ 73–74.) Call logs from this period reflect that Denman expressed to his mother that he was hearing voices again and attempted to rip up one of his t-shirts, presumably to make a noose again. (Id. ¶ 69.) On October 22, 2021, Denman was transferred back to SCI Camp Hill. (Id. ¶ 68.)

Plaintiff alleges that, on or about October 27, 2021, Denman exhibited self-injurious behavior, "like what he exhibited previously," and refused to take his medication. (Id. ¶ 70.) Denman had "fresh cut marks" on his left wrist and reported to Christina Ludwig, a psychological service associate working at SCI Camp Hill, that he had "a lot going on" and did not feel that his medications were helping. (Id. ¶¶ 39, 72.) Denman further reported to psychological services specialist Robert Wimer that he wanted to slit his throat, mentioning his mother's cancer diagnosis and the change in his medication during his recent two-month stay at LCCF. (Id. ¶ 73.) While not entirely clear from the second amended complaint, it appears that at some point very soon after the above events, Denman was placed in a Psychiatric Observation Cell ("POC"). (Id. ¶¶ 74–77.)

By October 28, 2021, Defendant Wanga determined that Denman, despite refusing to come out of his cell for a psychiatric assessment, would be given more items and discharged from the POC over the weekend. (Id. ¶ 77.) On October 29, 2021, Defendant Wanga noted that Denman had "poor insight/judgment and impulse control" but nevertheless discharged him from the POC with only a restriction against possession of a razor. (Id. ¶ 78.) Defendant Wanga did not recommend or provide any instruction that Denman be monitored following his release from the POC, nor did he request LCCF's records to confirm the care and medication that Denman received during his stay at LCCF. (Id. ¶¶ 79–80.) Plaintiff asserts that it does not appear that Defendant Wanga's decision to discharge Denman with "minimal restrictions and recommendations" was reviewed by Defendant Mushtaq or any other supervising physician from the DOC or MHM. (Id. ¶ 81.) Plaintiff alleges that "Wanga was not qualified to render such decisions and opinions on mental health," and that neither the DOC nor MHM had a policy requiring physician supervision. (Id.) On October, 29, 2021, following Denman's discharge

4

from the POC, Ludwig noted that Denman's insight was "'[p]oor, [that he was] unable to express concerns[ or] reason as to why he cut himself, and [that he did] not want to work on his mental health." (Id. ¶ 82.) Ludwig further noted that rather than focusing on his conversation with her, "[Denman] stared at the cut on his wrist." (Id.)

On November 4, 2021, a new Individual Recovery Plan ("Plan") was created for Denman, signed by Kristie Gerson and agreed to by "Newton, Stein, Ludwig, Davidson, and Taylor." (Id. ¶¶ 84, 89.) The Plan noted that Denman failed to take his medication as prescribed, was unable to identify any coping skills, was making no progress towards treatment goals, and did not wish to attend group therapy. (Id. ¶ 85.) The Plan further contained a section to "Create a Safety Plan" to establish "Collaborative Strategy to Ensure Personal Safety Before, During, and/or After Crisis." (Id. ¶ 86.) In the safety plan section of the Plan, it was specifically noted that Denman could not identify any coping skills to ensure his own personal safety when he began to experience signs and symptoms indicating that he might pose a danger to himself. (Id. ¶ 87.) This was the last recorded contact Denman had with any psychologist, psychiatrist, or other mental health provider before he was discovered without a pulse, hanging from his bunk bed at 5:26 am on November 23, 2021. (Id. ¶ 88.) In fact, a post-mortem chart review signed by Ludwig on November 23, 2021 reflects that Denman went at least fifteen days without contact with psychology or psychiatry prior to his death despite being housed on the treatment cell block of SCI Camp Hill. (Id. ¶ 90.)

Plaintiff asserts that "Denman's mental health records repeatedly note, inter alia, voices/hallucinations, suicidal ideations, and medications not working." (Id. ¶ 94.) Further, Plaintiff alleges that, throughout his incarceration, Denman relayed the fact that those voices instructed him to harm himself. (Id. ¶ 95.) Plaintiff emphasizes that "[d]espite Mr. Denman's

5

well-documented and well-known mental health issues, Mr. Denman had access to a rug, which Defendants knew or should have known could be used to construct a noose." (Id. ¶ 96.) Plaintiff further asserts that "although Mr. Denman was mentally unstable and a high risk for suicide, Defendants failed to check on him for at least '7 hours'" on the night he died. (Id. ¶ 97.) During this time, Denman was able to deconstruct the rug and use the material to construct a noose with which to hang himself, a process "which presumably [took] several hours at a minimum." (Id. ¶ 98.) Ultimately, Denman used the self-constructed noose to hang himself from his cell bunk. (Id. ¶¶ 1, 102.) It was not until approximately 6:00 am on November 23, 2021 that correctional officers discovered Denman's lifeless body. (Id. ¶ 99.)

Plaintiff asserts that Denman's suicide in November 2021 "was not an anomaly, but rather a part of an ongoing, systemic breakdown that has continuously failed those with serious mental illnesses within the Pennsylvania State Prison system." (Id. ¶ 93.) According to Plaintiff, the Pennsylvania State Prison system "has a long history of failing to protect its inmates who experience various mental illnesses—especially those who seek to harm themselves." (Id.) Plaintiff points to a news article from The Philadelphia Inquirer reflecting that the rate of prison suicides nearly doubled between 2008 and 2018, and more than tripled from 2014 (181) to 2018 (551). (Id.) According to that same article, while the suicide rate among the general population rose by 22% between 2008 and 2017, the suicide rate in Pennsylvania prisons grew by 103%. (Id.)

Plaintiff alleges that, despite numerous and repeated inmate suicides and suicide attempts over the years, "Defendants failed to create, implement and/or enforce the necessary policies and customs to protect inmates of SCI Camp Hill, thereby establishing a custom of violating the rights of those within their custody and control." (Id. ¶ 121.) Of those necessary policies and

6

customs that Plaintiff alleges Defendants did not create, implement and/or enforce, she specifically points to Defendants' failure "to adhere to the Misson Statement stated on the D[epartment] of C[orrections]'s website," and failure "to adhere to its own policy, D[epartment] O[f] C[orrections] Policy 13.8.1, related to mental health care." (Id. ¶¶ 123–24.) Plaintiff asserts that, at a minimum, Defendants were duty bound to follow well-established suicide prevention standards and guidelines, such as the 2014 Standards for Health Services in Jails, the 2015 Standards for Mental Health Services for Correctional Facilities, and the 2019 Suicide Prevention Resource Guide National Response Plan for Suicide Prevention in Corrections. (Id. ¶¶ 132–39.)

## B. Procedural History

On November 17, 2023, Plaintiff filed her initial complaint, asserting both federal civil rights claims and related state-law tort claims. (Doc. No. 1.) Plaintiff named as Defendants John Wetzel, then Secretary of the Pennsylvania Department of Corrections; George Little, the subsequent Acting Secretary of the Pennsylvania Department of Corrections; Laurel Harry, then Superintendent of SCI Camp Hill (collectively with former Secretary Little and Wetzel "Government Official Defendants"); MHM Correctional Services, LLC, d/b/a MHM Solutions, a contractor providing psychiatric and mental health services to inmates at SCI Camp Hill; Correct Care Solutions n/k/a Wellpath, LLC ("CCS"), a contractor providing health care services to inmates at SCI Camp Hill; Medical Providers John/Jane Does (1-10) at SCI Camp Hill; and Correctional Officers John/Jane Does (1-10) at SCI Camp Hill. (Id. ¶¶ 11–17.) Plaintiff's initial complaint asserted the following four counts: a Section 1983 claim alleging violations of Decedent's Eighth Amendment rights against all Defendants (Count I); a state-law medical negligence claim against all Medical Provider Defendants (Count II); a state-law wrongful death

claim against all Defendants (Count III); and a state-law survival action claim against all Defendants (Count IV).  (Id. ¶¶ 49–73.)

On January 22, 2024, Defendant MHM filed a motion to dismiss Plaintiff's initial complaint (Doc. No. 7), and a brief in support thereof on February 5, 2024 (Doc. No. 8).  On February 19, 2024, Plaintiff filed an unopposed motion to extend the time to respond to Defendant MHM's motion (Doc. No. 9), which the Court subsequently granted (Doc. No. 10), giving Plaintiff until April 19, 2024 to respond to Defendant MHM's motion.  On December 11, 2023, pursuant to Pennsylvania Rule of Civil Procedure 1042.7, Defendant MHM submitted a "Notice of Intention to Enter Judgment of Non Pros for Failure to File a Certificate of Merit."[2] (Doc. No. 6.)  On February 23, 2024, Defendant CCS followed suit with the filing of their own "Notice of Intention to Enter Judgment of Non Pros for Failure to File a Certificate of Merit." (Doc. No. 14.)  Defendant CCS subsequently filed a motion to dismiss Plaintiff's initial complaint (Doc. No. 19) on March 8, 2024, and brief in support of that motion on March 20, 2024 (Doc. No. 22).  On April 5, 2024, the Government Official Defendants also filed a motion to dismiss Plaintiff's initial complaint (Doc. No. 23), with a brief in support of their motion following ten days later (Doc. No. 24).

_____

[2]  The text of the rule states, in relevant part, as follows:

> (a) The prothonotary, on praecipe of the defendant, shall enter a judgment of non pros against the plaintiff for failure to file a certificate of merit within the required time provided that (1) there is no pending motion for determination that the filing of a certificate is not required or no pending timely filed motion seeking to extend the time to file the certificate,   (2) no certificate of merit has been filed, (3) except as provided by Rule 1042.6(b), the defendant has attached to the praecipe a certificate of service of the notice of intention to enter the judgment of non pros, and (4) except as provided by Rule 1042.6(b), the praecipe is filed no less than thirty days after the date of the filing of the notice of intention to enter the judgment of non pros.

See Pa. R. Civ. P. 1042.7.

Subsequently, on April 19, 2024, Plaintiff filed an amended complaint which preserved her prior claims, named all of the same Defendants, and included a certificate of merit.[3]  (Doc. No. 25.)  Thereafter, on May 10, 2024, Defendant CCS filed a motion to dismiss Plaintiff's amended complaint (Doc. No. 31), and a brief in support thereof on May 20, 2024 (Doc. No. 31).  On May 22, 2024, the Court issued an Order (Doc. No. 33) deeming Plaintiff's amended complaint filed, denying as moot the three pending motions to dismiss Plaintiff's initial complaint (Doc. Nos. 7, 19, 23), and directing all Defendants to respond to the amended complaint by June 3, 2024.

On June 3, 2024, Defendant MHM and the Government Official Defendants each filed motions to dismiss the amended complaint.  (Doc. Nos. 34, 35.)  On June 17, 2024, Defendant MHM and the Government Official Defendants filed briefs supporting their respective motions to dismiss.  (Doc. Nos. 36, 37.)  On July 29, 2024, Plaintiff filed a stipulation dismissing the Government Official Defendants from the instant action.  (Doc. No. 43.)  On July 30, 2024, the Court issued an Order approving the stipulation, denying the Government Official Defendants' motion to dismiss as moot, and instructing the Clerk of Court to terminate each of the Government Official Defendants from this case.  (Doc. No. 44.)  On July 31, 2024, Plaintiff filed a brief opposing Defendant MHM's motion to dismiss her amended complaint.  (Doc. No. 46.)  On August 14, 2024, Defendant MHM filed a reply brief in further support of its motion to dismiss Plaintiff's amended complaint.  (Doc. No. 47.)  On August 16, 2024, Plaintiff and Defendant CCS filed a joint stipulation dismissing Plaintiff's Section 1983 claim against

---

[3]  Certificates of merit are required by Pennsylvania Rule of Civil Procedure 1042.3(a) "in any action based upon an allegation that a licensed professional deviated from an acceptable professional standard" and must be "file[d] with the complaint or within sixty days after the filing of the complaint."  See Pa. R. Civ. P. 1042.3(a).

Defendant CCS.  (Doc. No. 48.)  On August 19, 2024, the Court approved that stipulation, dismissing Plaintiff's Section 1983 claim, without prejudice, only as it pertains to Defendant CCS.  (Doc. No. 49.)  On August 30, 2024, Plaintiff and Defendant CCS filed a joint stipulation dismissing CCS from this case without prejudice (Doc. No. 50), which the Court accordingly approved on September 4, 2024 (Doc. No. 51).

On March 28, 2025, the Court issued an Order granting Defendant MHM's motion to dismiss Plaintiff's amended complaint (Doc. No. 53), and providing Plaintiff leave to file a second amended complaint to address the pleading deficiencies identified in the accompanying Memorandum (Doc. No. 52).  As reflected in the Memorandum, the Court found that the amended complaint contained factual allegations plausibly showing that MHM's employees acted with deliberate indifference by failing to take steps to prevent Denman's suicide, thereby plausibly alleging a violation of Denman's rights under Section 1983.  (Id. at 21.)  However, the Court concluded that Plaintiff had not plausibly alleged that Defendant MHM was liable for their employee's alleged deliberate indifference, because Plaintiff failed to plead facts showing that the constitutional violation resulted from a policy or custom of Defendant MHM, as required to state a Section 1983 claim against a private entity.  (Id. at 24.)

On April 17, 2025 Plaintiff filed her second amended complaint (Doc. No. 54), preserving her previously mentioned claims,[4] renaming MHM as a defendant, and further adding the following Defendants: Kevin Wanga, a registered nurse practitioner at SCI Camp Hill;

---

[4]  Count II in the second amended complaint is now labeled as a "Professional Negligence" claim against all "Specialist Defendants" (which Plaintiff defines as "All Individual Defendants other than Officer Taylor"), see (Doc. No. 54 at 30), whereas previous iterations of the complaint labeled it a "Medical Negligence" claim against "Medical Provider Defendants," see (Doc. Nos. 1 at 15; 25 at 18).

Salone Kamau ("Kamau"), a registered nurse at SCI Camp Hill; Loriann Saltzer ("Saltzer"), a registered nurse at SCI Camp Hill; Dr. Saiqa Mushtaq, M.D., a medical doctor at SCI Camp Hill; Robert Wimer ("Wimer"), a psychological services specialist at SCI Camp Hill; Angela Davidson ("Davidson"), a psychological services specialist at SCI Camp Hill; Christopher Snyder ("Snyder"), a correctional officer at SCI Camp Hill; Mark Spengler ("Spengler"), a correctional officer at SCI Camphill; Taylor ("Taylor"),[5] a correctional officer at SCI Camp Hill; Elicia Stein, Psy. D. ("Stein"), a psychologist at SCI Camp Hill; Christina Ludwig ("Ludwig"), a psychological services associate at SCI Camp Hill; Kristie Gerson ("Gerson"), a psychological services associate at SCI Camp Hill; Medical Providers John/Jane Does (1-10) at SCI Camp Hill; and Correctional Officers John/Jane Does (1-10) at SCI Camp Hill. (Id. ¶¶ 28–42.)

On June 16, 2025, Defendants MHM, Wanga, and Mushtaq jointly filed the instant motion to dismiss (Doc. No. 65), with their brief in support following on June 30, 2025 (Doc. No. 66). On August 29, 2025, after receiving two extensions of time, Plaintiff filed her brief opposing the MHM Defendants' motion to dismiss her second amended complaint. (Doc. No. 85.) Subsequently, on September 22, 2025, the MHM Defendants filed a reply brief in further support of their motion to dismiss Plaintiff's second amended complaint. (Doc. No. 90.) Having been fully briefed, the MHM Defendants' motion to dismiss Plaintiff's second amended complaint is ripe for disposition.

On August 11, 2025, Defendants Davidson, Gerson, Ludwig, Snyder, Spengler, Stein, and Wimer collectively filed a motion to extend the time to respond to Plaintiff's second amended complaint (Doc. No. 71), followed by a second motion to extend on August 14, 2025 (Doc. No.

---

[5] Plaintiff states that the first name of this individual is currently unknown to them. (Doc. No. 54 ¶ 37.)

11

73).  The Court granted both motions (Doc. Nos. 72, 74), extending their deadline to respond to the second amended complaint until September 14, 2025.  On September 23, 2025[6], Defendants Davidson, Gerson, Kamau, Stein, and Taylor collectively filed a motion to dismiss Plaintiff's second amended complaint (Doc. No. 92), and on October 7, 2025, moved for a thirty-day extension of time to file a supporting brief (Doc. No. 93).  The Court subsequently granted the motion for an extension of time to file a brief in support on October 8, 2025.  (Doc. No. 94.)  On January 7, 2026, after Defendants Davidson, Gerson, Kamau, Stein, and Taylor failed to file a brief in support of their motion to dismiss the second amended complaint, the Court issued an order deeming their motion to dismiss withdrawn.  (Doc. No. 95.)  A review of the docket reveals that Defendants Davidson, Gerson, Kamau, Stein, and Taylor have not refiled their motion to dismiss the second amended complaint or otherwise filed any response to the second amended complaint.  Moreover, despite being granted two extensions of time in August 2025 (Doc. Nos. 72, 74), Defendants Snyder, Spengler, Ludwig, and Wimer failed to file a response to the second amended complaint.

On August 27, 2025, Plaintiff filed individual certificates of merit as to each applicable defendant, including Defendants Mushtaq and Wanga.  (Doc. Nos. 79, 82.)  Subsequently, on September 18, 2025, Plaintiff filed a motion requesting an enlargement of time to serve the summons and second amended complaint on Defendant Saltzer (Doc. No. 88), which the Court accordingly granted on the same day, providing Plaintiff until December 17, 2025 to effectuate

---

[6]  On September 15, 2025, Christine Einerson, Deputy Attorney General and legal representative of Defendants Ludwig, Davidson, Snyder, Spengler, Kamau, Gerson, Stein, Taylor and Wimer, filed a letter with this Court stating that, pursuant to Chief Judge Brann's Standing Order 2025-05, all civil cases in which a deputy attorney general entered an appearance were stayed until September 22, 2025.  (Doc. No. 87.)  Accordingly, Ms. Einerson, on behalf of the aforementioned defendants, requested permission to file a response to Plaintiff's second amended complaint by September 23, 2025.  (Id.)

service (Doc. No. 89).  Nevertheless, as of the time of the writing of this Memorandum, Plaintiff has yet to file proof of service of the summons and complaint on Defendant Saltzer.

## II.    LEGAL STANDARD

Federal notice and pleading rules require the complaint to provide the defendant notice of the claim and the grounds upon which it rests.  See Phillips v. County of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008).  The plaintiff must present facts that, accepted as true, demonstrate a plausible right to relief.  See Fed. R. Civ. P. 8(a).  Although Federal Rule of Civil Procedure 8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled to relief," a complaint may nevertheless be dismissed under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted."  See Fed. R. Civ. P. 12(b)(6).

When ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and all reasonable inferences that can be drawn from them, viewed in the light most favorable to the plaintiff.  See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 341 n.42 (3d Cir. 2010) (citations omitted).  The Court's inquiry is guided by the standards of Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009).  Under Twombly and Iqbal, pleading requirements have shifted to a "more heightened form of pleading."  See Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).  To prevent dismissal, all civil complaints must set out "sufficient factual matter" to show that the claim is facially plausible.  See id.  The plausibility standard requires more than a mere possibility that the defendant is liable for the alleged misconduct.  As the Supreme Court instructed in Iqbal, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the

13

pleader is entitled to relief.'"  See Iqbal, 556 U.S. at 679 (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

Accordingly, to determine the sufficiency of a complaint under Twombly and Iqbal, the United States Court of Appeals for the Third Circuit ("Third Circuit") has identified the following steps a district court must take under Rule 12(b)(6): (1) identify the elements a plaintiff must plead to state a claim; (2) identify any conclusory allegations contained in the complaint "not entitled" to the assumption of truth; and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief." See Santiago v. Warminster Township, 629 F.3d 121, 130 (3d Cir. 2010) (quoting Iqbal, 556 U.S. at 679).

In ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."  See Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

## III.    DISCUSSION

The MHM Defendants move to dismiss the Section 1983 claims in Count I of Plaintiff's second amended complaint, arguing that Plaintiff fails to state an Eighth Amendment deliberate indifference claim against individual Defendants Wanga and Mushtaq, and as to their employing entity, Defendant MHM.  (Doc. No. 66 at 5–9.)  The MHM Defendants further seek a dismissal of Plaintiff's Count II professional negligence claim as to Defendants Wanga and Mushtaq,

14

arguing that Plaintiff failed to file proper certificates of merit.[7] (Id. at 10–12.) The Court first addresses the Section 1983 claims as to the individual defendants and Defendant MHM before addressing the state law claims.

### A.        Plaintiff's Section 1983 Claims Against the MHM Defendants

Section 1983 is the vehicle by which private citizens can seek redress for violations of federal constitutional rights committed by state officials. See 42 U.S.C. § 1983. The statute provides, in relevant part, as follows:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

See id. Section 1983 "does not . . . create substantive rights; it provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws." See Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). To state a claim for relief under Section 1983, a plaintiff "must allege the violation of a right secured by the Constitution and laws of the United States" and "show that the alleged deprivation was committed by a person acting under the color of the state law." See Harvey v. Plains Twp. Police Dep't, 421 F.3d 185, 189 (3d Cir. 2005) (quoting West v. Atkins, 48 U.S. 42, 48 (1988)).

---

[7] The MHM Defendants also argue that the Court should dismiss Plaintiff's survival and wrongful death claims asserted against it. (Doc. No. 66 at 11–12.) However, pursuant to Pennsylvania law, "wrongful death and survival actions are not substantive causes of action; rather, they provide a vehicle through which plaintiffs can recover for unlawful conduct that results in death." See Johnson v. City of Philadelphia, 105 F. Supp. 3d 474, 483 (E.D. Pa. 2015) (citation omitted), aff'd, 837 F.3d 343 (3d Cir. 2016). Accordingly, dismissal of these counts is only warranted to the extent that the Court dismisses the Section 1983 and professional negligence claims asserted against the MHM Defendants.

15

In the second amended complaint, Plaintiff asserts that the MHM Defendants, acting under the color of state law, violated Denman's Eighth Amendment rights by being deliberately indifferent to his serious medical and mental health needs, and particularly, his known vulnerability to suicide.  (Doc. No. 54 ¶¶ 126–28.)  Plaintiff alleges that, despite knowledge of Denman's "obvious suicidal propensities," the MHM Defendants failed to take the necessary and available precautions that would have saved his life.  (Id. ¶ 131.)

### 1.    Plaintiff's Section 1983 Claim Against Defendants Wanga and Mushtaq

The Eighth Amendment to the United States Constitution "prohibits prison officials from being deliberately indifferent to an inmate's serious medical needs."  See Palakovic v. Wetzel, 854 F.3d 209, 227 (3d Cir. 2017) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).  "[An inmate's] particular vulnerability to suicide qualifies as a serious medical need."  See Colburn v. Upper Darby Township (Colburn II), 946 F.2d 1017, 1023 (3d. Cir. 1991).  When a plaintiff seeks to hold prison officials or medical staff accountable for failing to prevent an inmate's suicide, the "vulnerability to suicide framework" applies.  See Palakovic 854 F.3d at 224.  To plead a claim under this framework and survive a motion to dismiss, a plaintiff must allege facts sufficient to plausibly show that: (1) the inmate had a particular vulnerability to suicide; (2) the prison official knew or should have known of the inmate's particular vulnerability; and (3) the prison official acted with reckless or deliberate indifference to the inmate's particular vulnerability.  See id. at 223–24.

Because the MHM Defendants do not dispute that the second amended complaint plausibly alleges that Denman had a particular vulnerability to suicide (Doc. No. 66 at 5–9), the Court confines its analysis to the second and third prongs of the Palakovic vulnerability to suicide framework.  For reasons discussed below, the Court finds that Plaintiff's second amended

16

complaint plausibly alleges a Section 1983 Eighth Amendment vulnerability to suicide claim against Defendant Wanga but fails to do so with regard to Defendant Mushtaq.

### a.     Knowledge of Particular Vulnerability to Suicide

Prison officials have been found to "know" of an inmate's particular vulnerability to suicide where "they have had actual knowledge of an obviously serious suicide threat, a history of suicide attempts, or a psychiatric diagnosis identifying suicidal propensities." See Palakovic, 854 F.3d at 230 (citing Colburn II, at 1025 n.1.). However, as indicated "by the latter portion of [the] phrase [knew or should have known]," "it is not necessary that [a] custodian have a subjective appreciation of the detainee's 'particular vulnerability.'" See Colburn II, 946 F.2d at 1024–25. In Palakovic, the Third Circuit found that the plaintiffs had pleaded facts plausibly supporting a reasonable inference that prison officials and medical personnel "knew or should have known" of the decedent's particular vulnerability to suicide because decedent's records "which the corrections officers and medical staff must have—or, at the very least, should have—reviewed when considering both his treatment and whether or not to repeatedly place him in solitary confinement," contained information about prior suicide attempts, a designation as a "suicide behavior risk" with a "Stability Rating D," multiple serious mental illness diagnoses, and placement on a mental health roster. See Palakovic, 854 F.3d at 230–31.

In the instant case, the MHM Defendants do not meaningfully challenge that Defendant Wanga had knowledge of Denman's particular vulnerability to suicide. (Doc. No. 66 at 8–9.) Accordingly, the Court limits its analysis of prong two to Defendant Mushtaq.

As to Defendant Mushtaq, the MHM Defendants argue that Plaintiff fails to allege facts sufficient to impute knowledge of Denman's risk of suicide, as Mushtaq is not alleged to have had any contact with or involvement in Denman's care, but only to have purportedly failed to

17

review Defendant Wanga's discharge order.  (Doc. No. 90 at 7.)  The MHM Defendants further assert that Defendant Mushtaq's failure to take an action "which by Plaintiff's allegations [she] was not required [to]" belies any inference that Mushtaq was subjectively aware of any excessive risk to Denman's health and safety.  (Doc. No. 66 at 8.)  Plaintiff, in response, argues that "Wanga was well aware of Denman's extensive mental health issues and prior attempts at self-strangulation," but fails to make a similar assertion as to Defendant Mushtaq.  (Doc. No. 85 at 15.)

Upon careful consideration of the second amended complaint, the arguments of the parties, and relevant authority, the Court finds that Plaintiff fails to plausibly allege that Defendant Mushtaq knew or should have known of Denman's particular vulnerability to suicide. The Court notes, as an initial matter, that the Third Circuit has made clear that plaintiffs alleging a deliberate indifference to a particular vulnerability to suicide claim are not required to plead facts suggesting that a defendant had actual or subjective knowledge of the particular vulnerability.  See Palakovic, 854 F.3d at 231 (finding that in the context of a vulnerability to suicide claim that "the District Court erroneously applied a subjective test, examining what the officials 'were actually aware of as opposed to what they should have been aware of'").  Thus, counter to Defendants' assertion, it is not necessary for Plaintiff to show that Defendant Mushtaq "was subjectively aware of any excessive risk to Denman's health and safety."  (Doc. No. 66 at 8.)  Nonetheless, the Court finds that the facts alleged in the second amended complaint are insufficient to plausibly show that Defendant Mushtaq knew or should have known of Denman's particular vulnerability to suicide.  See Diorio v. Harry, No. 21-1416, 2022 WL 3025479, at *5 (3d Cir. Aug. 1, 2022) ("Although our case law does not require actual knowledge, . . . there

18

must still be enough in the record to establish that defendants knew or should have known that the harm would come about.").

Unlike Defendant Wanga, who is alleged on at least one occasion to have medically assessed Denman—and thereby to have had reason and opportunity to become acquainted with Denman's records and his presenting mental state, Defendant Mushtaq is not alleged to have had any contact with Denman or to have been involved in his care or treatment at all. (Doc. No. 54 ¶¶ 77–81.) In fact, outside of the section describing the parties, Defendant Mushtaq's name appears just once in the second amended complaint, in a statement alleging that "[i]t does not appear that [Wanga's] decision to discharge with Mr. Denman minimal restrictions and recommendations was reviewed by Mushtaq or any other supervising physician." (Id. ¶¶ 8, 81.) Because the second amended complaint does not allege that Defendant Mushtaq at any point interacted with Denman or was personally involved in his care, it thereby fails to plausibly allege that Defendant Mushtaq knew or should have known of Denman's particular vulnerability to suicide. See Carrol v. Lancaster County, 301 F. Supp. 3d 486, 498 (E.D. Pa 2018) (finding the allegations insufficient to impute knowledge of the decedent's particular vulnerability to suicide where the defendant was not alleged to have interacted with the decedent prior to his suicide). Having determined that Plaintiff's second amended complaint fails to plead the knowledge requirement as to Defendant Mushtaq, the Court turns to the third prong of the vulnerability to suicide framework as to Defendant Wanga.

        **b.**       **Deliberate Indifference to Particular Vulnerability to Suicide**

Reckless or deliberate indifference to an inmate's particular vulnerability to suicide requires a showing of "something beyond mere negligence" on the part of the prison officials. See Palakovic, 854 F.3d at 222 (citing Colburn II, 946 F.2d at 1024–25). Although "each case

19

will present unique circumstances and should be considered on its own facts," the Third Circuit

has held that the following factual scenarios "provide helpful guidance in determining whether a

prison official has acted with deliberate indifference to an inmate's particular vulnerability to

suicide":

> where: (1) a defendant took affirmative action directly leading to the suicide; (2) a
> defendant actually knew of the suicidal tendencies of a particular prisoner and
> ignored the responsibility to take reasonable precautions; or (3) a defendant failed
> to take "necessary and available precautions to protect the prisoner from self-
> inflicted wounds."

See id. at 231.

Here, the MHM Defendants argue that Plaintiff's claim regarding Defendant Wanga's

allegedly improper discharge of Denman from the POC on October 29, 2021, amounts to, at

most, simple negligence, as "allegations supporting a '[l]ack of due care suggest no more than a

failure to measure up to the conduct of a reasonable person,' not a state of mind egregious

enough to constitute deliberate indifference." (Doc. No. 66 at 9 (quoting Cabrera v. Clerk, No.

16-cv-00392, 2018 WL 347727, at *5 (M.D. Pa. Jan. 10, 2018))). Plaintiff, in turn, argues that

"in spite of knowing Denman's particular vulnerability to suicide," Defendant Wanga

demonstrated deliberate indifference to that vulnerability by discharging Denman from the POC

without adequate restrictions and without instruction for his monitoring post-discharge. (Doc.

No. 85 at 15.)

Upon careful consideration of the second amended complaint, the arguments of the

parties, and relevant authority, the Court finds that Plaintiff's second amended complaint

plausibly alleges reckless or deliberate indifference to Denman's particular vulnerability suicide

by Defendant Wanga. Plaintiff alleges that, shortly before Defendant Wanga's medical

assessment of Denman, on or around October 28, 2021, Denman refused his medication, had

fresh self-harm marks on his left wrist, and had recently returned from a stay at LCCF where he

20

had been placed on suicide watch after engaging in an act in furtherance of a suspected self-strangulation attempt.  (Doc. No. 54 ¶¶ 67–74.)  Plaintiff further alleges that, despite these circumstances, including Denman's refusal to come out of his cell for his assessment and Defendant Wanga's observation that Denman exhibited poor insight, judgment, and impulse control, Defendant Wanga discharged Denman from the POC without first reviewing his LCCF records and with no recommendation or instruction for his monitoring after release.  (Id. ¶¶ 77–79.)  The Court finds these factual allegations sufficient to plausibly allege that Defendant Wanga failed to take the "necessary and available precautions to protect [Denman] from self-inflicted wounds" and was thereby deliberately indifferent to his particular vulnerability to suicide.  See Palakovic, 854 F.3d at 231.  Having found that Plaintiff plausibly alleges a deliberate indifference claim as to Defendant Wanga, the Court turns to whether Plaintiff plausibly alleges deliberate indifference liability against Defendant MHM.

### 2.      Plaintiff's Section 1983 Claim Against Defendant MHM

At the outset, the Court notes that Defendant MHM is a private corporation contracted to provide psychiatric, medical, and mental health services to inmates at SCI Camp Hill.  (Doc. No. 54 ¶¶ 8, 126–39.)  Private contractors operating in a state run prison facility cannot be held liable for Eighth Amendment violations under a theory of respondeat superior or vicarious liability for the acts of their employees.  See Natale v. Camden County. Corr. Facility, 318 F.3d 575, 583 (3d Cir. 2003) (citing Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 691 (1978)).  Rather, a plaintiff "must allege a policy or custom that resulted in the alleged constitutional violations at issue" in order "to state a claim against a private corporation providing medical services under contract with a state prison system."  See Palakovic, 854 F.3d at 232 (citing Natale, 318 F.3d at 583–84); Monell, 436 U.S. at 691.

Here, the MHM Defendants argue that Plaintiff fails to identify any policies or customs specific to MHM that would support her deliberate indifference claim.  (Doc. No. 66 at 6.)  They maintain that "as was the case with the First Amended Complaint," Plaintiff continues to cite policies and/or customs applicable to the Pennsylvania Department of Corrections generally without specifying what responsibility, if any, MHM bore with regard to those practices.  (Id.) Plaintiff argues that the policies for suicide prevention cited in the second amended complaint, though not specific to MHM, are policies that must be adhered to by those contracted to provide medical and mental health services in prisons, including SCI Camp Hill.  (Doc. No. 85 at 19.) Plaintiff maintains that it can be reasonably inferred from the second amended complaint that Wanga and Mushtaq's failure to prevent Denman's suicide was the result of a policy or custom of MHM that did not require them to take any action to prevent Denman from committing suicide. (Id.)  Plaintiff further argues that Mushtaq's failure to supervise Wanga was the result of an MHM policy that did not require physician supervision.  (Id. at 20.)

Upon careful consideration of the second amended complaint, the arguments of the parties, and relevant authority, the Court concludes that Plaintiff has adequately identified at least one policy specific to MHM that may permit a finding of liability.  As noted supra, Plaintiff alleges that Defendant Mushtaq's failure to review Defendant Wanga's discharge decision stemmed from an MHM policy that did not require physician supervision of registered nurse practitioners.  (Doc. No. 54 ¶ 81.)  Plaintiff further alleges that Defendant Mushtaq's failure to properly supervise Defendant Wanga allowed the latter to make clinical decisions regarding Denman's care that he was not qualified to make.  (Id.)  Accordingly, Plaintiff contends that it can be plausibly inferred that this policy contributed to Denman's suicide, as a change in policy—i.e., requiring physician oversight over registered nurse practitioners or their direct

22

examination and decision-making regarding vulnerable inmates—may have altered the outcome here.  (Doc. No. 85 at 20.)  The MHM Defendants, in turn, do not contest that MHM's corporate policy lacked any requirement for physician supervision; rather, they argue that Plaintiff failed to allege facts demonstrating that MHM had a duty to implement such a policy.  (Doc. No. 90 at 3.)

The MHM Defendants misconstrue the pleading requirements of a Monell claim, as it is not necessary that a plaintiff plead facts showing that the defendant had a "duty" to adopt a specific policy, but only to show that the defendant maintained a policy or custom that "resulted in the alleged constitutional violations at issue."  See Palakovic, 854 F.3d at 232.  Moreover, the Third Circuit in Natale established that the absence of a policy or the failure to implement one more responsive to an inmate's serious medical needs can form a basis for Monell liability.  See Natale, 318 F.3d at 585 (holding that a reasonable jury could find deliberate indifference where defendant failed to establish a policy addressing the immediate medication needs of inmates with serious medical conditions).  As plaintiff's second amended complaint alleges facts plausibly supporting the reasonable inference that Defendant MHM's lack of a policy requiring physician supervision of registered nurse practitioners contributed to the failure to prevent Denman's suicide, the Court accordingly finds that the second amended complaint plausibly alleges Monell liability against Defendant MHM.  Having found that the second amended complaint alleges a Section 1983 claim against Defendants Wanga and MHM, the Court turns to Plaintiff's state law negligence claim against Defendants Wanga and Mushtaq.

### B.    Plaintiff's Professional Negligence Claim Against Defendants Wanga and Mushtaq

In Count II of Plaintiff's second amended complaint, Plaintiff asserts a Pennsylvania state law professional negligence claim against "all individual Defendants other than Officer Taylor." (Doc. No. 54 ¶¶ 140–44.)  The MHM Defendants move to dismiss this claim as to Defendants

23

Wanga and Mushtaq, arguing that Plaintiff failed to file a certificate of merit satisfying the requirements of Pennsylvania Rule of Civil Procedure 1042.3 and 1042.10.  (Doc. No. 66 at 10–12.)

Pennsylvania Rule of Civil Procedure 1042.3 states that, "within sixty days after the filing of the complaint" in "any action based upon an allegation that a licensed professional deviated from an acceptable professional standard," a plaintiff must file a certificate of merit that either:

> (1) an appropriate licensed professional has supplied a written statement that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional standards and that such conduct was a cause in bringing about the harm, or
> (2) the claim that the defendant deviated from an acceptable professional standard is based solely on allegations that other licensed professionals for whom this defendant is responsible deviated from an acceptable professional standard, or
> (3) expert testimony of an appropriate licensed professional is unnecessary for prosecution of the claim.

See Pa. R. Civ. P. 1042.3(a)(1)–(3).  Pennsylvania Rule of Civil Procedure 1042.3(b)(1) further mandates that "a separate certificate of merit shall be filed as to each licensed professional against whom a claim is asserted," while 1042.10 sets out the form that all certificates should take.  See Pa. R. Civ. P. 1042.3; see also Pa. R. Civ. P. 1042.10 (providing that the certificate "shall be substantially in the following form" and then setting forth the three alternatives under Pa. R. Civ. P 1042.3(a) with a box for a checkmark before each alternative).  Where a plaintiff fails to file a certificate of merit within the required time period, Pennsylvania Rule of Civil Procedure 1042.7 provides that the "the prothonotary, on praecipe of the defendant, shall enter a judgment of non pros against the plaintiff for failure to file a certificate of merit," so long as:

> (1) there is no pending motion for determination that the filing of a certificate is not required or no pending timely filed motion seeking to extend the time to file the certificate, (2) no certificate of merit has been filed, (3) except as provided by Rule

24

1042.6(b), the defendant has attached to the praecipe a certificate of service of the notice of intention to enter the judgment of non pros, and (4) except as provided by Rule 1042.6(b), the praecipe is filed no less than thirty days after the date of the filing of the notice of intention to enter the judgment of non pros.

See Pa. R. Civ. P 1042.7 (a)(1)–(4).

The MHM Defendants argue that the certificate of merit that Plaintiff appended to her first amended complaint "is not substantially in the form required by Pa. R. Civ. P 1042.10," and "plainly does not meet the requirements of Pa. R. Civ. P 1042.3(b)(1)" as it is "a single document applied to all Defendants." (Doc. No. 66 at 11.) The MHM Defendants ultimately maintain that Plaintiff's failure to file a certificate of merit complying with the various dictates of the Pennsylvania Rule of Civil Procedures warrants a dismissal of her professional negligence claim "on that basis alone." (Id.) Plaintiff, in response, does not dispute the allegation that her prior certificate of merit failed to comply with Pennsylvania Rule of Civil Procedure 1042.10 and 1042.3(b)(1). (Doc. No. 85 at 21.) Instead, she points to the fact that she has since filed separate certificates of merit against each defendant, including Defendants Wanga (Doc. No. 82) and Mushtaq (Doc. No. 79).[8] She further asserts that these new certificates comply with "the intent and substantive requirements of Pa. R. Civ. P. 1042.3." (Doc. No. 85 at 21.)

As an initial matter, the Court notes that, at the time of the filing of Plaintiff's second amended complaint, Third Circuit precedent established that state certificate-of-merit requirements were substantive law that federal courts were required to apply when adjudicating applicable state-law claims. See Liggon-Redding v. Est. of Sugarman, 659 F.3d 258, 262–65 (3d Cir. 2011) ("Pennsylvania Rule 1042.3, mandating a certificate of merit in professional negligence claims, is substantive law under the Erie Rule and must be applied as such by federal

---

[8] The Court notes that the filing of these certificates occurred after the filing of the Plaintiff's second amended complaint, and after the MHM Defendants' filing of their brief in support of the instant motion to dismiss.

25

courts); <u>see also</u> <u>Schmigel v. Uchal</u>, 800 F.3d 113 (3d Cir. 2015) (affirming the same); <u>Chamberlain v. Giampapa</u>, 210 F.3d 154 (3d Cir. 2000) (applying <u>Erie</u> principles and concluding that "the New Jersey affidavit of merit statute is substantive state law that must be applied by federal courts sitting in diversity"). However, as of the time of the writing of this memorandum, this precedent has since been overruled by the United States Supreme Court's recent holding in <u>Berk v. Choy</u>, No. 24-440, 2026 WL 135974 (U.S. Jan. 20, 2026).

In <u>Berk v. Choy</u>, the plaintiff ("Berk") brought suit against a medical center and physician alleging a claim of medical malpractice arising out of the care he received in connection with an ankle injury. <u>See</u> <u>Berk</u>, 2026 WL 135974, at *2. Under the relevant Delaware law, plaintiffs were prohibited from filing a health-care negligence lawsuit "unless the complaint is accompanied by" an "affidavit of merit . . . signed by an expert witness . . . stating that there are reasonable grounds to believe that there has been health-care medical negligence committed by each defendant." <u>See</u> Del. Code Ann. tit. 18, § 6853(a)(1). In an attempt to comply with Section 6853, Berk promptly moved for an extension of time but was ultimately unsuccessful in finding a doctor willing to provide an affidavit. <u>See</u> <u>Berk</u>, 2026 WL 135974, at *3. After a contested attempt to use his sealed medical records as a substitute for an affidavit, Berk thereafter asserted that Section 6853 was not enforceable in federal court because it is displaced by the Federal Rules of Civil Procedure. <u>See</u> <u>id.</u> The district court disagreed and dismissed the lawsuit for failure to comply with Delaware's affidavit law. <u>See</u> <u>id.</u> The Third Circuit affirmed, and the Supreme Court granted certiorari. <u>See</u> <u>id.</u>

The central question on appeal was whether Berk's lawsuit could be dismissed due to his failure to file an expert affidavit with his complaint. <u>See</u> <u>id.</u> In addressing this question, the Supreme Court noted that, although the Rules of Decision Act directs federal courts adjudicating

26

state law claims to "apply state substantive law, leaving federal law to cover the rest," state substantive law "must [nevertheless] yield if the Constitution, a treaty, or a statute, 'otherwise require[s] or provide[s].'" See id. (quoting 28 U.S.C. § 1652). Accordingly, "a valid [Federal] Rule of Civil Procedure displaces contrary state law even if the state law would qualify as substantive under Erie's test." See id. (quoting Hanna v. Plumer, 380 U.S. 460, 467–69 (1965)). Applying this principle, the Supreme Court found that Federal Rule of Civil Procedure 8 resolved the question at hand. See id. Rule 8 "prescribes the information a plaintiff must present about the merits of his claim at the outset of litigation: 'a short and plain statement of the claim showing that [he] is entitled to relief.'" See id. at *3–*4 (quoting Fed. R. Civ. P. 8(a)(2)). By requiring no more than a statement of the claim, the Supreme Court noted, "Rule 8 establishes 'implicitly, but with unmistakable clarity,' that evidence of the claim is not required." See id. at *3 (quoting Hanna, 380 U.S. at 470). The Supreme Court further noted that "unless the Federal Rules single out a claim for special treatment . . . Rule 8 sets a ceiling on the information that plaintiffs can be required to provide about the merits of their claims." See id. at *4.

Applying the above findings, the Supreme Court determined that Delaware's affidavit requirement "[was] at odds with Rule 8 because it demands more . . . ." See id. (stating that "[u]nder Rule 8, factual allegations are sufficient, but under Delaware law, the plaintiff needs evidence too"). As both Rule 8 and Section 6853 were found to address the same issue, namely, "what information a plaintiff must provide about the merits of his claim at the outset of litigation," and Section 6853 "in doing so, imposes a different standard," the Supreme Court accordingly held that Rule 8 displaces the contrary state law. See id. at *4–*7 (concluding that "Delaware's affidavit law does not apply in federal court"). As a result of the Supreme Court's ruling that state affidavit and certificate of merit laws do not apply in federal courts, the Court

27

will deny the MHM Defendants' motion to dismiss Plaintiff's professional negligence claim against Defendants Wanga and Mushtaq.

### C. Plaintiff's State Law Wrongful Death and Survival Claims against the MHM Defendants

Counts III and IV of Plaintiff's second amended complaint assert a wrongful death and survival claim against all Defendants. (Doc. Nos. 54 ¶¶ 145–51.) The MHM Defendants argue that these claims must be dismissed as they rely on insufficiently pleaded claims subject to dismissal. (Doc. No. 66 at 11–12.) As the Court has determined that the underlying Section 1983 claims are adequately pleaded as to Defendants MHM and Wanga, and Plaintiff's professional negligence claims are adequately pleaded as to Defendant Wanga and Mushtaq, the Court will deny the MHM Defendants' request to dismiss these claims.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part the MHM Defendants' motion to dismiss the second amended complaint. The Court will dismiss Plaintiff's Section 1983 claim against Defendant Mushtaq but will deny the motion in all other respects. An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania

28